The government presented insufficient evidence that Mr. Pires conspired with his uncle and or with Eli to commit sex trafficking of a minor. A conspiracy conviction requires proof of an intent to agree and also an intent to commit the same substantive offense or pursue the same criminal objective as the principal. The government did not present sufficient evidence that Mr. Pires shared this intent and formed such an agreement with either his uncle or with Eli. In connection with his uncle, typically, intent or this intent or agreement cannot be inferred from a single buyer-seller transaction. There is no evidence and the government has pointed to none that his uncle was anything. But this doesn't seem like a buyer-seller transaction because you really have three people involved. Two people, uncle and defendant, working to produce third person for the sex act. So it seems like what the conspiracy is, is those two working together to produce the object, so to speak. And that would seem like that's what the conspiracy is. The relationship between the uncle and Mr. Pires is still just a buyer-seller relationship. There's no additional evidence related to the uncle. There's no evidence of him. But if you take the uncle away, isn't there still enough for a jury to make that determination if there's a conspiracy with Eli? As to Eli, I don't think that there is sufficient evidence. I think that there we need to look to cases that talk about mere knowledge, mere association, mere presence with conspiracies. Eli is a friend of Mr. Pires. They had a pre-existing relationship. And Eli also has a long, about a year-long pre-existing relationship with Kathy. Mr. Pires is homeless. He and Daisy have, they are living in cars. And Eli offers him a place to stay. Well, isn't that problematic? Because the record suggests that having a place to stay, particularly a bedroom, is necessary to what he wants to do criminally, in other words. There's no evidence that Eli has any interest in the commercial sex either way. But Eli gets them the place and effectively harbors them while they're conducting the sex trade. And he actually invites them, if I'm not mistaken, to move over there. He tells them that he has a place, but the conversations they have is not about commercial sex. Eli does not say, you can make more money there. Eli does not say, I want a cut of the money. But doesn't he, he's got to be aware of what's going to go on, what's happening in there. Even if he is aware of it, but he, well, he's not necessarily aware of what's going to happen in the future. He, there is evidence and testimony that he was aware of what had been happening. But he doesn't talk about wanting it to continue, needing it to continue, wanting to help it continue. And once that is reflected further, once they get to Kathy's house, Kathy sees everything that's going on. Nothing is hidden. And Eli is not involved. Eli is not in any conversations. He is not posting any ads. He is not... Right. But one of the elements, one of the ways to prove the crime is harbor. So place to stay. He finds a place to stay. I understand that the testimony was disputed on this, but the idea was he was giving drugs to the woman whose place it was. And I know he was doing that before. But jury might be able to conclude he was doing it for another reason now, which is to just keep her, you know, okay with it. And so he, even if he's just doing a favor for his friend by helping to find a place for the woman to stay, wouldn't that be enough? Even if that were to be enough, perhaps for the substantive offense, we don't have a case here where Eli is charged with a substantive offense. And so the question is whether he has an intent to agree to do something further, to conspire further, to join in the overall criminal case. But is he giving the room to something further? Like I'm helping to get you the room. That's what I'm doing. And I know what you're doing and you need a room. And so that's my role. There's a million other things that need to happen, but this is my role. Isn't that enough to make me the conspirator? I don't think that it is. I think he does have to have an intent to agree to do more. And one case I would point to is McMillan, which is a Fourth Circuit case, where there were two individuals who were both involved in sex trafficking, and they had some sort of activities in common. And one of the things that they had in common was that they would give each other rides places. And one of the things that the court said was that there's no evidence that these rides were in support of sex trafficking activities. So if Eli is merely giving the place to stay in support of a friend, wanting to help a friend, that is not enough. So suppose your client was planning, told Eli he was planning a bank robbery, and Eli then said, here's a car to use. Wouldn't that be enough? He supplies the getaway car. I think one of the differences there is that he's saying, here is a car to use. He knows your client needs a car as the getaway vehicle, and he goes out and he gets a car and supplies it to your client. Isn't the car like the room here, which he supplies to your client? I would argue that in this case it's not, because the room is also a place that Mr. Pira simply needs in order to live at this stage. And where Eli is showing no interest, no involvement, no statements about what's happening, what could happen, wanting it to happen, not wanting it to happen, he's sort of agnostic as to what happens. He's simply saying to a friend, hey, I've got a place that you can stay. I've been using it for my own purposes, and you can stay there. And I think that under the government's formulation, there is the potential that anyone who helps a friend, knowing that that friend is somehow involved in commercial sex work, is now involved in a conspiracy with the trafficker. Let me put an analogy. Harboring an illegal alien is a crime. Would you say this is different, because harboring an illegal alien is per se a crime, than harboring somebody who's in a sex traffic is not a crime? Are you sort of suggesting that? It can be criminalized, but it's not. I think one of the critical pieces here is that this is conspiracy. So there are these added intent pieces that come along with conspiracy, and that's what's not met here. So it's not a case... There was testimony, right, that drugs were given to Burke by Eli to keep her okay with the arrangement, right? I understand that there was other testimony, but there was testimony on that point, right? Not that targeted, if I may, a little bit. There was testimony that Kathy Burke and Eli had known each other for approximately a year at the time that the events of this case happened. He had been giving her drugs that entire time in exchange for sex.  Also in exchange for him using her place so he could talk to other friends, not Mr. Pires, completely separate people, about his own drug activities. Nothing about any of that arrangement changes. So there's no targeted testimony that says, you know, these drugs were needed in order to keep her quiet about this. And there's no indication that Kathy needed the drugs to be quiet about having, you know, Daisy and Mr. Pires in her apartment. There's nothing that specific about it, that that was something that was necessary to her to continue doing these activities. Suppose he had another friend that was selling drugs and he had another bedroom and said to that other friend, you want to stay here, a place you can stash your drugs? If Eli had said that to a friend? Yeah. I mean, I think the key distinction remains that he's making specific statements about the crime, about the conspiracy. And that's what you don't have with Eli, is you don't have him saying. But we always say you can have a wink and a nod. You don't have to explicitly say it. I know what she's doing. You're my friend. Here's the room. I'll do, I think there's some evidence, I'll help with Kathy. And that seems like the quintessential jury question. I understand your argument, but it seems like that is ultimately what juries do, which is discern your narrative from, I'm sure, the narrative I'm going to hear a minute from now. I think here where there were many counterindications that Eli was not involved in the conspiracy, it was not reasonable for the jury to conclude that he was a co-conspirator. Moving to the expert testimony argument, much of Garibrant's testimony was irrelevant, unduly prejudicial, and would not have helped the jury understand otherwise obscure or complicated terms or technology. And I think it's really important to look at what this testimony was in this case. And, you know, there's both, the government cites many cases saying, well, sort of this broad type of testimony is. So a preservation question. So I think some of this stuff strikes me as potentially irrelevant in the sense that this was a relatively small operation and this agent is testifying to much larger operations that don't seem on point. But there was an overall objection sort of on irrelevance, but then there were no specific objections to particular questions. What is your view on the sort of preservation of some of those specific questions? I did argue in the opening brief and would continue to argue that everything was preserved here. If you look at the, you know, the way the objection went was the government proposed sort of six types of testimony. And Mr. Perez clearly objected to, the government does not argue that they didn't, he didn't object to those four types of testimony. He argued that those types of testimony were irrelevant, would not assist the fact finder, and were unduly prejudicial. Those types of testimony included typical means of targeting, recruiting, and maintaining victims, common ways of maintaining control over victims, common reactions of victims to abuse. And the testimony that is cited in the brief as improper, this testimony about sort of these very violent, large-scale drug trafficking, excuse me, sex trafficking cases where the agent is saying things like, traffickers are basically torturing their victims of extreme abuse, are threatening their children. He starts talking about strip searching. It's very, and it's long-term. This is a single victim and it's a two-week period. And that is so far from the facts of this case that it can't possibly not only not assist the fact finder, but be tied. But isn't there an obligation when that question is being asked to object, even though you may have said some of this is going to be irrelevant, and the judge says, well, I don't, you know, no, not at that level of generality. But now, even if there is some specific, when there are specific questions, isn't there some obligation at that point to say, listen, judge, this one is beyond your sort of general ruling? I think that here where there was a clear objection, the judge had clearly said the expert can testify that that was sufficient to preserve it. I did also argue and would continue to argue that even if this is on plain error, that testimony about those sort of violent, large-scale drug trafficking organizations was really plain error. You know, the government in its brief even says, well, the jury wouldn't have thought about this because it was irrelevant. I mean, they sort of acknowledged that this is just facially plainly not relevant to the facts of this case. Could you address, I know your time is almost up, but the last argument about the improper closing argument, anything you want to add about that? Yes. I would just say that, you know, and the argument about rebuttal was not objected to, but the closing argument was. But I want to say that, you know, in both of those arguments, the government is making this point, sort of the defense counsel, the defense, that going to trial is somehow wrong and improper, and that they had done something wrong by recalling Daisy to the stand, that defense counsel had done something wrong by arguing about the credibility of witnesses. I think those remarks were very clearly deliberate. The prosecutor knew that this inference was, that there was the potential for the jury to draw this inference and made sure that the inference did not fall on the government, made sure that there was no explanation of why Mr. Perez had recalled the victim, and very specifically spoke about that, said, you know, she was brought in here again today. And I think that the fact that this was deliberate, that it was not isolated, that it went to sort of the core trial rate is really reinforced by what's then said in rebuttal, that really saying that, you know, I, it's not, the prosecutor says it's not my role. I won't come in here and call people liars and racists and addicts, that taking that, making that, personalizing that, and really directly impugning the role of defense counsel adds great, extreme, much context to the claim that was preserved about closing. And I think that when you sort of consider the overall closing in its whole context, that it was both improper and harmful. Okay, thank you. You have three minutes for rebuttal. Thank you. Thank you, counsel. At this time, would counsel for the United States please introduce herself on the record to begin? Good morning. May it please the Court, Karen Eisenstadt for the government. Unless the Court has a different preference, I will go through the issues in the order that defense counsel just did. So there is clearly sufficient evidence to establish a conspiracy between the defendant and Eli. There's evidence that Eli knew Daisy was 16 because he had seen her missing child poster, which had her birth date. And from the defendant's brief, so this is undisputed, this is page 31 of the defendant's brief, there was evidence, I quote, that Eli knew the defendant was trafficking Daisy and that Eli helped them find a place to stay, knowing that they would continue these activities. In other words, when Eli suggested going to Norwood, he knew the defendant was pimping Daisy, a minor, and he knew that he would continue to do so. With all of that knowledge, Eli went to Norwood with the defendant to secure Burke's agreement to have Daisy stay there. And Burke gave her agreement in part because she was, as Eli put it, his bitch. And part of the reason she was, quote, his bitch is because he was her supplier of drugs. Then he warned Daisy not to tell Burke her real name or age. He helps come up with a fake name, Melissa, to give to Burke. Then he brought Daisy to Norwood with the defendant, and then he stayed there with them. In addition, when you look at the text after Daisy was recovered by the police, the defendant sends a text to Burke, hey, what happened to Melissa? Clearly concerned about what happened to Daisy. When Burke doesn't respond, it's Eli who texts her, you fuck me over, Kathy, every time. This is clearly something he was concerned about as well. What happened to Melissa? I think the defendant was homeless for a period of time. That's right. Suppose a local church had offered to provide him with a room, and if they knew what he and Daisy were doing out of that room, would that make the church guilty of conspiracy? I think based on this statute, yes, that would be. And I think, as I understand, the defendant argued based on what the government is saying, you know, Kathy could have been guilty of conspiracy as well, and the government agrees that she could have been charged with conspiracy as well. You're shrinking the distance to almost zero between knowledge and conspiracy. I think here, what's different here is the way the statute is written. So the actus reus of the statute here is harboring. So you need to participate in that actus reus. Causing the minor to engage in commercial sex acts is something you only need knowledge for under the statute. And if you look at the Brooks case in the Ninth Circuit, that's because Congress wanted this statute to be brought, not just to cover pimps themselves, but, you know, the people around them who are assisting in this process. So it's intentionally brought. But your friend would say, well, but harboring for the purpose of sex trafficking, and you could be indifferent to why they're living there or have another motive to want them to live there, and so you are just indifferent to what's going on, and does that still make you a conspirator? Yes, it does. Because, again, the defendants argue essentially that you need specific intent that the minor will be caused to engage in commercial sex acts. But this statute doesn't require that. And if you look at the contrast with the Mann Act, which does require specific intent regarding commercial sex acts, it's clear that Congress intended the difference between these two things. Here it's knowledge. I thought conspiracy generally required an intent to further the criminal activity. So the intent to agree or further the criminal activity here is the intent to agree and further the object crime, which is harboring Daisy in Norwood with the knowledge that she would be caused to commit commercial sex acts, which Eli agreed to do and then clearly voluntarily participated in through his actions. So the key is, just to make sure I understand it, 1591A talks about the substance of the crime is knowing someone is engaged in a commercial sex act, so I just have to agree to harbor knowing that other things are going to happen, and it doesn't matter whether I care that it happens, whether I'm indifferent, as long as I know it, that's the position, then that's still a conspiracy. Correct. That's the government's position. Based on the interaction of these two statutes? Yes. So that's based on the language of 1591A1, and also what the Supreme Court and this Court have said regarding what mens rea is necessary for a conspiracy. As the Court has said, it's based on the mental state required for the substantive offense itself. And here, with regard to the Commercial Sex Act, it's knowledge. It's helpful, I think, to contrast here A2 in the statute, so this is A1. A2 requires benefiting financially or by receiving anything of value with respect to participation in a venture that is engaging in A1-type activities. So Congress's choice not to put the benefiting from or receiving something of value in A1 is clearly a considered choice because A2 does have that requirement. A1 does not. Can you, just turning to the witness question, can you justify for me the scope of his testimony? It seemed to me at least quite broad and beyond the modus. I understand modus operandi evidence, I understand that, but it seemed like there were aspects of this that were far beyond what was necessary to understand what Mr. Peers was doing. Correct. So as an initial matter, this claim was not preserved. And the reason it's not preserved is his preservation is ground-specific, like what is the basis for the objection? And the basis for his objection to this testimony in the district court was that this is improper profiling. It will encourage the jury to convict me because my actions look consistent with what the expert is going to say. And you can see that in his motion and what he argued to the district court. This is essentially the opposite argument, which is it's not too close to the facts, it's too far from the facts, which was never his objection. And it makes sense he didn't make that objection because from the defendant's perspective, if Garibrandt was going to testify, he wanted the testimony to be as broad and generic as possible so he could distinguish it from his conduct. He didn't want it narrowly tailored to his case, and that is what he got here. So this is under plain error in the government's view. But regardless, it's clear. So even, just so I understand, even at a high level of generality, relevance wasn't one of the bases for sort of the overall objection? So in terms of just a high-level citing the 401 in relevance, yes, it said relevance. But the entire argument and what the district court responded to in ruling was this profiling objection. That's why the district court said, I read your cases. This doesn't seem like profiling to me, so I'll admit it. So there's no sense that what the objection is, is that he's going to cover things that are outside the scope of what I did. And if you look at the government's disclosure of the expert testimony, all of the things he's complaining about are in the disclosure, large-scale trafficking, stables, violence. So if he wanted to object to those as being outside the scope, he had every opportunity to do so. Well, isn't this type of objection necessarily meld both? You can't object just on – if it's truly irrelevant, you've got a point. But generally, everything has some relevance, so you're talking about balance of prejudice. So the relevance argument is backed up by pointing out the prejudice, i.e., the profiling. I think here the argument is the opposite. So the argument that the jury's hearing things that don't sound like what he did is not profiling. It's truly the opposite of profiling, that they're also hearing other things that I did not do. Profiling is that they're hearing about things that aren't consistent with what I did. These other things, which were in the government's disclosure, were never objected to, and I think that was strategic because if the testimony's coming in, having it being generic and broad is helpful to the defendant. You can see in the defense closing argument that they leveraged that to try to get the jury to disregard the expert testimony entirely. Do you think it was an error to admit? Let's just put aside preservation, which I think is important. Do you think it was an error to have testimony about stables of women in serious violent and strip searches that had nothing to do with what Mr. Pierce did? I mean, I could see where that could inflame a jury. If the defendant had objected, I think it would be an abuse of discretion to allow that in because it is not, in fact, pertinent to this case and what the defendant did. I think it came in because the defendant's objection was profiling and concerned that it was too close to the case, so the government tried to keep the testimony as generic as possible, and the agent didn't actually know anything about the case and so just was answering the questions in good faith based on all of his experience. Regardless, there's no prejudice here because it's so clearly generalized background testimony from a defendant, I mean, from an expert that admitted, I don't know anything about this case. Then it was never referenced again in the case, so there's no question in the jury's mind the expert. I mean, I read this testimony. I mean, it's horrifying. I mean, and you're hearing this guy who says, I've investigated hundreds of these cases, and here are the terrible things that happened, and I've said a bunch of things that connect up to Daisy's story, and then I say some really terrible things about other things that happened in the same general sort of kind of crime. It's hard to say that you can really separate out with such a fine distinction. The jury wouldn't be moved by that in a way that seems potentially prejudicial in the 403 kind of way. I mean, we've said some things that connect to Daisy, right? Some of this stuff connected to specific facts about Daisy, and you would tell me that's the good modus operandi testimony, and then we add on top some other really horrible stuff, and then you say, well, that's not prejudicial because they're going to know that it has nothing to do with Daisy. That seems like cutting it pretty fine. It's very clear that it has nothing to do with Daisy. So when the defendants are – Why would the government – I ask myself, why would the government offer this testimony? It seems the only reason to offer it is because of a suspicion that the jury will associate the defendant with that activity. Otherwise, why would the jury be hearing about it? It suggests that this other stuff was going on. We just don't have proof, but this is what they do. What happened here, as I understand it, is the government, maybe going too far, was trying to avoid the profiling issue. So they told the expert nothing about the case. And in asking questions, tried not even to lead the expert towards the parts of the case, the parts of trafficking that were relevant to the case. The expert truly knew nothing was coming and just speaking from his vast experience. So the government didn't ask any hypothetical questions because the defendant had objected to doing that. That would be too tailored to the case. And then didn't lead the expert, but just said, tell us about what you've seen. Then when you look at what the defense is pointing to in the government's closing argument, when he argues prejudice here, it's all the things that have to do with his conduct that make them consistent with typical patterns of what the expert called finesse pimping. There's no reference in the government closing argument to any of this other stuff because, in fact, he didn't do those things and the government wasn't alleging that he did those things. So the way the expert was presented as sort of blind to the case makes it more clear to the jury that he's just speaking generally and that he's not trying to connect any of those things to the case. Let me ask one, because there was no request for a specific jury instruction as to that testimony, correct? Correct. And there was no request by the defense to strike that testimony? Correct. So when the testimony came in, which, again, was covered in the disclosure from the government, so it could have been objected to before it came in, it was not objected to then either, which is why the government's view is that this is on plain error, that the district court had no reason to think that the defense was objecting to Garibrand's testimony because it was too far from what the defendant did because he said, I'm worried about being profiled here. And let me also ask, going to the jury instructions, I assume there's no issue on appeal, so I have to assume that the judge gave the proper jury instructions, that you have to make sure the defendant met the elements of the offense, and it all focused on that, nothing on this? Correct. So the closing argument and the instructions were all focused on this case. This is about what the defendant did, what Daisy testified to. As the defense points out, the case really rested on the credibility of Daisy and Kathy Burke, who testified to exactly what happened in this case. So on plain error, you think this fails on the third prong? You don't? I mean, it seems like you agree at least the first prong. Correct. The government's view is it definitely fails on the third prong. It could also fail on the second prong. There is some argument that it should not have been admitted if it had been objected to, that it is not, in fact, relevant to what this defendant did. Well, when it comes to prejudice, it's not only not objecting, as I said, it's also you can ask for jury instruction, you can ask to strike. So the defense there had other opportunities to do that. Correct. Even though it already went in. Correct. And as I pointed out earlier, in the defense closing argument, they're leveraging the fact that this is very broad generic testimony because that's what they wanted. If it was going to come in at all, it's better if it's not narrowly tailored to the defendant because he was very concerned that would be harmful to him, which I think it was. So he wanted it that way. That is why he didn't object. It was a strategic non-objection from the government's point of view. If the court has no more questions about that issue, I'll move on to the closing argument issue. Please, go ahead. So with respect to the closing argument, the district court who is aware of the party's heated behind-the-scenes dispute about recalling Daisy and then who heard the closing with that knowledge did not hear the government implying that the defense acted improperly in recalling Daisy. And the jury who did not know about the behind-the-scenes dispute would not have heard that either from what the government said. What happened here is the district court handled the recall of Daisy very effectively and made it seem completely unremarkable. And credit to the district court for doing that and to defense counsel for having a brief, straightforward examination that did not come across as harassing or anything like that. That's the context the jury had. That doesn't give them any basis for making the leap from she did testify twice or she was brought back a second time to there was something improper in doing so. And the government doesn't dispute that we fought tooth and nail to try to keep the defense from being allowed to recall Daisy. So we argued a parade of warbles, the optics will be terrible, et cetera. But when we lost the issue, we moved on. You look at the transcript, the heated rhetoric. As soon as we lost, it was gone. And as a matter of fact, which sometimes happens, all of those horribles that we invoked in trying to win the point didn't happen. That's not how the evidence came in, and that's not how the jury heard it. And in fact, she did testify twice, and she was brought back, and the jury knew that. Correct. They saw her twice. Correct. She did come back. That was the very morning before closing arguments. So there's no question the jury knew she came back a second time. With respect to the rebuttal argument, if I may just have a moment. There was no plain error. There's no plain improper impugning of counsel's role here. And on that point, I think it's very notable that defense counsel, who had just objected to the closing argument, apparently didn't hear anything like that either. It's just a brief unscripted lead-in to the point of the rebuttal, which was, you've heard a bunch of labels thrown around. Don't focus on labels. It's not the lawyer's job, my job, to judge witness credibility. It is your job, the jury's job. That's all that happened here, and it was a mere passing remark. Okay. Thank you, counsel. Thank you. Okay. Ms. DiMasso, you've got three minutes for rebuttal. Please reintroduce yourself back on the record to begin. Chrissy DiMasso for Mr. Pires. I want to make two really quick factual points about the sufficiency argument. And the first is just that the government conceded that it was reasonable to infer that the reason that Mr. Pires and Daisy used fake names was not to hide the commercial sex, but instead to hide the fact that she was a runaway, that it was actually for a separate purpose from the criminal objective here. And I also want to point out that the text messages that the government discusses were sent three hours apart. There's no indication of where Mr. Pires and Eli even were as these messages, whether either knew that the other had sent them. They're quite distant in time. They're not immediate responses to each other. Moving to the preservation of the expert witness, this was absolutely preserved. It was raised, it was argued that this testimony did not meet Rule 702, Rule 401, and Rule 403. It is quite common that there are multiple grounds for objections, and here there was concern about profiling evidence, and evidence came in that was profiling evidence. You have the government saying, well, they wanted it general. Well, there was plenty of quite specific evidence that came in, some of which we also objected to and continue to object to. But this huge generalized stuff that had absolutely nothing to do with this case, it came in. And the only reason it could have possibly come in is because the government wanted the jury to profile Mr. Pires not only as someone who had engaged in criminal sex work once or twice or for two weeks, it wanted them to associate, as Judge Chioda said, it wanted them to associate him with this broader, worse type of sex trafficking that was simply not at issue here. And let me ask. Let's assume we find that this was not preserved. You would still say it's plain error? Yes. Yes. I think that this was so large and so noticeable. And whether or not the government is pointing to this evidence in its closing, it is repeatedly talking about Special Agent Garibrandt in its closing, over and over and over again. It is coming back to it and identifying him as an expert witness and talking about all the ways that his expert testimony supports. But that's because there are parts of, I mean, you may disagree, but if I'm interested in the irrelevant part, there's a relevant part, which is the modus operandi, the reason that they use fake names is X, Daisy used a fake name. Like, okay, and the agent told you that. That seems like at least arguably what's allowed. And then you have something else. So I don't see why, if you are referencing the agent with regards to the specific things that are allowed, that seems to be pointing the jury in the right direction, which I think your friend would say diminishes the prejudice. I think where this case was really just about what really two percipient witnesses said, that repeatedly going back to the expert is telling the jury, hey, that's what you need to listen to because that's what was going on here. And it is unbelievable for me to think that the jury would not remember and have absorbed this sort of, because it was really, it was extensive, and it talked about really horrible things, that that would not have gotten into the jury's mind and be associated with expert Garrett Brandt for the rest of the case. Thank you. Okay. Thank you, counsel. Thank you both. It's always a pleasure to have you here. Have a good day. Let's call the next case.